519 P.2d 1149

**The STATE of Arizona, Appellee,**

**v.**

**Richard Allen EBERT, Appellant.**

**No. 2739.**

Supreme Court of Arizona,
In Banc.

March 14, 1974.

Gary K. Nelson, Atty. Gen., by Howard L. Fell, Asst. Atty. Gen., Phoenix, and Charles L. Weninger, Third Year Law Student, University of Arizonia, Tucson, for appellee.

O'Dowd, Fahringer & Diamos by Clay G. Diamos, Tucson, for appellant.

CAMERON, Vice Chief Justice.

This is an appeal from a jury verdict and judgment of guilt to the crime of unlawful sale of narcotics, § 36–1002.02 A.R.S., and a sentence thereon of not less than six years nor more than ten years in the Arizona State Prison.

We are asked to answer the following questions on appeal:

1. Did the court err in denying defendant's request for a continuance?
2. Did the court err in denying defendant's motion for a mistrial, or a new trial based on the possible prejudice to one of the jurors?

The facts necessary for a determination of this matter on appeal are as follows. On or about 12 July 1972, an undercover narcotics agent of the Metropolitan Area Narcotics Squad of Tucson, Arizona, went to a residence on South 4th Avenue in Tucson and, after being admitted, purchased from the defendant two papers of heroin. The defendant, along with his wife, was indicted on the 27th day of July 1972 for unlawful sale of narcotics. After some preliminary matters, at which time the trial of the defendant Ebert and his wife was severed, the defendant went to trial on 16 January 1973.

Three witnesses were called by the State. The first, Officer Neil Edwin Teitjen, an undercover agent for the Metropolitan Area Narcotics Squad of Tucson, testified that after being admitted to the premises of the defendant he told defendant he needed some heroin for himself and his wife. The defendant then obtained a bag of folded yellow and white papers from his wife and went behind a partition in the back of the room where the agent was given two papers in return for a $20

bill. The agent then left and hitchhiked to 4th Avenue where he met two other agents.

The second witness, Fred C. Ball, a special agent with the Metropolitan Area Narcotics Squad, testified that he and another officer let Officer Teitjen off near defendant's house and picked him up after the purchase.

Joan Arlene Davis, a criminalist, testified that the substance was heroin in usable amounts. The defendant did not testify and presented no other witnesses.

During the trial the defendant moved for a continuance in order to obtain witnesses who would show entrapment. The motion was denied. He also moved for a mistrial based upon misconduct by a third party which allegedly prejudiced one of the jurors against the defendant. This motion was denied.

The jury returned a verdict of guilty and the defendant moved for a new trial based upon the same prejudice. This was denied, and from the verdict, judgment, sentence, and denial of the motion for new trial defendant appeals.

## DENIAL OF CONTINUANCE

After the close of the State's case, the defendant moved for a directed verdict, based on entrapment as a matter of law, which was properly denied. State v. McKinney, 108 Ariz. 436, 501 P.2d 378 (1972). Defendant then moved for a continuance in order to subpoena witnesses to show that there was entrapment. The defendant, although represented by counsel, argued:

> "MR. EBERT: I feel as though the witnesses I would like to have subpoenaed would be to my benefit to show the corrupt way the law enforcement agencies are with regard to obtaining heroin from individuals, and, also, the fact that I was made a deal after the arrest was made. In fact, the same night Detective Gomez and Chief of Police Gordy (phonetic) from the South Tucson Police Department, that

if I cooperated with them that this case would not be held against me.

I followed through with my end of the bargain, and here I am appearing on this case right now, and I feel as though I should have these people here to testify to show that I'm telling the truth, so to speak.

The ones that I would like to have subpoenaed to begin with is Joe Turon, which was in my house at that particular date.

I would like to have Persian (phonetic) who is an undercover agent; Thomas Gomez, who is an undercover agent; also, Sgt. Ridgely (phonetic) who is a Sergeant of the Police Department of South Tucson or Metro. Also, I would like to have Fred Ball recalled to show that his statement pertaining to sending the first agent to my house—show the Court that—to discredit his statement he made in court yesterday because he had been proven guilty of entrapment on November 3rd in Division 10 in front of Judge Fenton with the same prosecuting attorney right here, and if he will do it once, there is doubt whether he would do it again or not.

I think that this would be very helpful in my defense.

\*     \*     \*     \*     \*     \*

> "THE COURT: You have known about all of these people ever since this case started, Mr. Ebert. It's been possible to subpoena them ever since you have been under indictment. We can't at this point stop the trial.

> "MR. EBERT: Well, see, Your Honor, as busy as the Public Defender's Department is, the only person I seen in regards to this case was an investigator and then approximately— on, probably a month ago, I probably seen Mr. Lane, but this was on another matter, and this was mentioned, but come down right to the details of all the matters involved in this, there wasn't that much time involved in it.

"THE COURT: Well, there is no reason, really, why these people could not, really, have been subpoenaed a long time ago to be here. I just can't grant a continuance.

"MR. EBERT: See, I was under the assumption this was supposed to be dropped. This is why I made no effort into contacting these people because in my estimation by the words of Sgt. Ridgely this was supposed to have been dismissed.

"THE COURT: On the state of the record as I have it here, Mr. Ebert, I really don't have much choice but to deny your request for a continuance.

The record indicates on August 10 you were arraigned and counsel was appointed. There is no change in that situation."

■ The granting of a continuance is generally within the trial court's discretion and the party desiring such continuance must show good cause to the trial court. Rule 241, Rules of Criminal Procedure, 17 A.R.S.; State v. Guthrie, 108 Ariz. 280, 496 P.2d 580 (1972); United States v. Mirenda, 443 F.2d 1351 (9th Cir. 1971), cert. den., 404 U.S. 966, 92 S.Ct. 343, 30 L.Ed.2d 286. In the instant case, there was a failure to show that the defendant did not have ample opportunity to obtain his witnesses, and there was no showing of surprise.

The case was a simple one in which an undercover agent testified without contradiction that he purchased two papers of heroin from the defendant which heroin was identified by the criminalist of the City-County Crime Laboratory. There was no substantial or reasonable evidence of entrapment and no indication to the court that the witnesses the defendant was asking to subpoena at that late date would influence the outcome of the trial or would be otherwise helpful to the defendant.

■ Nor do we find that the failure of defendant's attorney to subpoena the witnesses requested by the defendant at the time the motion was made, denied the defendant the effective assistance of counsel. State v. Renaud, 108 Ariz. 417, 499 P.2d 712 (1972); State v. Kruchten, 101 Ariz. 186, 417 P.2d 510 (1966); State v. Cuzick, 5 Ariz.App. 498, 428 P.2d 443 (1967). We find no error.

## PREJUDICE OF THE JUROR

■ Prior to the commencement of the trial, three prospective jurors were excused because they had sat on another trial in which the defendant had been charged with another offense. During the trial, one of the jurors selected was seated outside in the hall when two of the excused jurors allegedly discussed the prior trial. This was brought to the attention of the court; the juror was brought into the courtroom; and the following questions were asked:

"THE COURT: Mrs. Pablo, I wonder if you could sit down for just a moment. I just wanted to clarify a certain point.
Do you have any knowledge from any source of Mr. Ebert, he is the defendant, or his background?

"A No, I don't.

"THE COURT: Okay. I just wanted to make sure on that point. Thank you very much. I appreciate your coming.
   *    *    *    *    *    *

"THE COURT: The motion for a mistrial is denied.
I feel we have to take Mrs. Pablo's word on what she knows or doesn't know." .

After the jury verdict the defendant moved for a new trial based primarily on the prejudice of the juror. At the hearing on the motion for new trial, Mrs. Pablo testified again as follows:

"Q Calling your attention to the 17th of January at approximately 10:00 in the morning, did the bailiff have a conversation with you out in the hall prior to your being brought into the Judge's chambers?

"A Yes.

"Q  Who was present when this conversation took place?

"A  In the Judge's chambers?

"Q  Who was present with you?

"A  I can't remember.  The ladies, but all the jurors were out there.

\*     \*     \*     \*     \*     \*

"BY MR. TANDY:

"Q  What did the lady say to you?

"A  The lady that was excused?

"Q  Yes.

"A  She said that she sat on the case before and that's why they were getting excused.

"Q  Did she say what case she was talking about?

"A  No.

"Q  Did you know what she was talking about?

"A  No, I didn't.

"Q  You didn't have any knowledge of Mr. Ebert?

"A  No.

"Q  Did that influence your deliberations in this case at all, the comment that was made?

"A  No.

"Q  You feel you sat fairly and impartially and your verdict was based upon the evidence?

"A  Yes."

Joan Farmer testified:

"Q  Calling your attention to the 16th, prior to the jury being selected, did you happen to overhear one or two ladies talking about a previous case they had sat on?

"A  I didn't overhear.  I was part of it.

"Q  Would you tell us the substance of that conversation?

"A  Betty Carlson is a friend of mine and she was telling me that he had been on the trial—I'm very nervous —the day—I guess a week before, and Mr. Ebert was being tried, and she said it was something about burglary, television and heroin, and that was—this lady was sitting next to Betty.

"Q  Where did this take place?

"A  Out in the—what do you call it— corridor.

"Q  The lady you are talking about, is that lady Mrs. Pablo?

"A  Yes.

"Q  Was this in her presence?

"A  Yes.

"Q  You don't know if she heard the conversation?

"A  I don't know how she could help it.

\*     \*     \*     \*     \*     \*

"Q  How long were you sitting out there on the bench?

"A  How long?

"Q  Yes, with Mrs. Pablo sitting there.

"A  She and Betty were sitting there the whole time we were waiting to be called in.  I was there only five minutes.

\*     \*     \*     \*     \*     \*

"Q  Did it appear that she overheard the conversation concerning Mr. Ebert's trial?

"A  She would have had to be stone deaf not to hear it."

We have held that potential prejudice to a juror is not necessarily grounds for a mistrial or a new trial.  State v. Rivera, 103 Ariz. 458, 445 P.2d 434 (1968).

"This court has previously held that extraneous evidence prejudicial to the defendant which reaches the jury by way of the news media may be cause for reversal under the proper circumstances. Babb v. State, 18 Ariz. 505, 163 P. 259. See also, Marshall v. United States, 360

U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250. The determination, however, of whether the jury's exposure to newspaper accounts while the trial is in progress is ground for a new trial or mistrial rests to a large degree in the sound discretion of the trial court. Marshall v. United States, supra; United States v. Howell, 3 Cir., 240 F.2d 149; State v. Thompson, 273 Minn. 1, 139 N.W.2d 490; People v. Gambino, 12 Ill.2d 29, 145 N.E.2d 42; State v. McLaughlin, 250 Iowa 435, 94 N.W.2d 303; Thistle v. People, 119 Colo. 1, 199 P.2d 642; State v. Cunningham, 173 Or. 25, 144 P.2d 303. * * *" State v. Chambers, 102 Ariz. 234, 236, 428 P.2d 91, 93 (1967).

However, in a recent case concerning jury prejudice, we reversed due to the fact that the jurors had read a newspaper article under the headline "Convicted Killer Faces New Charge":

"When the article was brought to the attention of the trial judge, the jurors were interrogated individually and two of them admitted having read part of the article. Both stated that as soon as they saw that the article referred to Skinner, they stopped reading it, and that it would not influence their decision. The court therefore denied a motion for mistrial and later denied a motion for a new trial.

\* \* \* \* \* \*

"The trial court stated that it believed the jurors' statements that they would judge the case solely on the evidence, admonished the entire jury to do so, and ordered the trial to continue.

"In the case of Marshall v. United States, 360 U.S. 310, 79 S.Ct. 1171, 3 L. Ed. 1250, the trial judge handled the matter in the same way, but the Supreme Court of the United States reversed and said:

'The trial judge had a large discretion in ruling on the issue of prejudice resulting from the reading by jurors of news articles concerning the trial. . . . Generalizations beyond that statement are not profitable, because each case must turn on its special facts. We have here the exposure of jurors to information of a character which the trial judge ruled was so prejudicial it could not be directly offered as evidence. The prejudice to the defendant is almost certain to be as great when that evidence reaches the jury through news accounts as when it is a part of the prosecution's evidence. . . . It may indeed be greater for it is then not tempered by protective procedures. . . . [W]e think a new trial should be granted.'

"As was stated in United States v. Montgomery, D.C., 42 F.2d 254, 257, the granting of a mistrial assured that the course of justice in the courts 'should seem, as well as be, free from all outside influence, direct or indirect'." State v. Skinner, 108 Ariz. 553, 554, 503 P.2d 381, 382 (1972).

Each case must rest on its peculiar fact situation. The facts in the instant case can be distinguished from Skinner, supra, in that in Skinner there was no doubt that the jurors had been exposed to highly prejudicial information. In the instant case, there is conflict between the testimony of the juror and Joan Farmer as to whether the prejudicial statements were in fact heard by the juror and if so to what extent they were understood by the juror. The trial court evidently gave greater weight to Mrs. Pablo's testimony that she did not have any knowledge of the defendant's previous trial than he did to Joan Farmer's testimony that Mrs. Pablo could not help hearing the conversation.

Reading the testimony at the motion for mistrial as well as the motion for new trial, we cannot say that the trial judge abused his discretion in denying both motions. We do not believe that the defendant has shown sufficient facts which would compel this court to declare the denial of

the motion for a mistrial or a new trial error.

Judgment affirmed.

HAYS, C. J., and STRUCKMEYER, LOCKWOOD and HOLOHAN, JJ., concur.