612 P.2d 1023

**The STATE of Arizona, Appellee,**

v.

**Douglas Edward GRETZLER, Appellant.**

No. 3750.

Supreme Court of Arizona,
In Banc.

April 21, 1980.

Rehearing Denied June 3, 1980.

Robert K. Corbin, Atty. Gen. by William J. Schafer III and Crane McClennen, Asst. Attys. Gen., Phoenix, for appellee.

Hoffman & Brown, P. C. by David S. Hoffman, Tucson, for appellant.

CAMERON, Justice.

Defendant, Douglas Gretzler, was charged in two indictments by a Pima County grand jury with one count of burglary, A.R.S. § 13–302; one count of kidnapping for robbery with a gun, A.R.S. §§ 13–491, –492; two counts of robbery with a gun, A.R.S. §§ 13–641, –643(B); and two counts of first degree murder, A.R.S. §§ 13–451, –452, –453.[1] After jury verdicts and judgments of guilt, Gretzler was sentenced as follows: death for the crime of first degree murder, two counts; not less than twenty-five years nor more than fifty

years each for the crimes of robbery, burglary and kidnapping, to run concurrently. Notice of appeal to this court was filed by the Clerk of the Pima County Superior Court pursuant to Rule 26.15 of the Arizona Rules of Criminal Procedure, 17 A.R.S.

The defendant raises some fifty-four questions on appeal. For purposes of convenience, we have grouped these questions under the following headings:

1. Challenges to the Grand Jury.
2. Extradition and Speedy Trial.
3. Consolidation and Severance.
4. Defendant's Competence to Stand Trial.
5. Objections to Identification Witnesses.
6. Alleged Failure of the State to Make Full Disclosure to the Defense.
7. Claims Concerning the Jury.
8. Admissibility of Defendant's Confessions.
9. Objections to Evidentiary Rulings.
10. Challenges to Miscellaneous Rulings Made During Trial.
11. Objections to Rulings Involving the Expenditure of Public Funds for the Defense.
12. Alleged Misconduct of Trial Judge and Prosecutor's Office.
13. Constitutionality of the Death Penalty.

The acts on which the instant prosecution was based were the kidnapping of Vincent Armstrong and the murders of Patricia and Michael Sandberg in Tucson, Arizona, on 3 November 1973. These crimes were but two events in an essentially undisputed chain of episodes involving Douglas Gretzler and Willie Steelman. See *State v. Steelman*, 120 Ariz. 301, 585 P.2d 1213 (1978). Gretzler and Steelman were responsible for the deaths of at least seventeen human beings in the autumn of 1973.

In late December of 1972, Gretzler abandoned his wife and infant daughter in New

1. Except where otherwise noted, Title 13 citations in this opinion are to the Arizona Criminal Code as it existed prior to its extensive revision effective 1 October 1978.

York City, leaving no word of his intentions or whereabouts. He drove to Casper, Wyoming, and then to Denver, Colorado, where he met and moved in with Willie Steelman and Steelman's sister. At this point, Gretzler's criminal record consisted of minor traffic charges and one count of vagrancy.

On 11 October 1973, Gretzler, Steelman and a woman friend left Denver for Phoenix, Arizona. In Globe, Arizona, the two men committed an armed robbery of a sunbathing couple; the robbery netted them five dollars. Later on the same day, they picked up a hitchhiker, tied him to a tree and stole his clothes, a ring and twenty dollars. On 15 October, the trio arrived in Phoenix where they pawned the ring and robbed a woman of twenty dollars and some checks.

Shortly after the trio's arrival in Phoenix, the woman set forth on her own. Steelman and an Arizona acquaintance known as "Preacher" went out to settle a drug-related dispute involving Preacher's brother. Both Preacher and his brother died in the resulting melee.

Through two young men, Ken Unrein and Mike Adshade, Gretzler and Steelman learned that acquaintances of Steelman named Bob Robbins and Yafah Hacohen were living at an area trailer park. All four visited the couple. Following the visit, Gretzler and Steelman kidnapped Unrein and Adshade in their Volkswagen van and drove to Stanislaus County, California, where, on 17 October 1973, the pair garroted and stabbed Unrein and Adshade to death. They hid the bodies and continued to drive the Volkswagen until it stopped running, at which point they began to hitchhike. On 20 October, they kidnapped a young couple who stopped for them near Petaluma, California. Steelman raped the woman captive, but eventually both victims were released at an underground garage, where Gretzler and Steelman stole another car.

Concerned that Bob Robbins and Yafah Hacohen would eventually connect them with the disappearance of Unrein and Adshade, Gretzler and Steelman decided to return to Arizona and silence the couple. On the way to Phoenix, they picked up a hitchhiker named Steve Loughren. The three stayed overnight with Robbins and Hacohen; the following evening, Gretzler and Steelman murdered Loughren in an isolated area near the Superstition Mountains. They then returned to their friends' trailer. On 25 October, while Hacohen was at work, they garroted and shot Robbins to death and hid his body. When Hacohen returned home, she, too, was murdered.

Gretzler and Steelman then moved on to Tucson where they shared a "crash pad" with some local street people. On 2 November, while hitchhiking with some of their Tucson acquaintances, they were picked up by Gilbert Sierra, whom they murdered later that night. They drove the victim's car to a parking lot, where they wiped their fingerprints off the vehicle and abandoned it.

On 3 November, Gretzler and Steelman kidnapped Vincent Armstrong who stopped for them while they were again hitchhiking. Armstrong escaped from his moving car and notified police of his abduction and the theft of his vehicle. His captors drove his Pontiac Firebird to a Tucson condominium complex, where Michael Sandberg was washing his white Datsun in the parking lot. They parked the Firebird in an inconspicuous corner of the lot and forced Sandberg to take them to his condominium where his wife Patricia was studying. While in the Sandbergs' home, Gretzler dyed his blond hair to brown. Both he and Steelman changed from jeans to slacks and coats belonging to Michael Sandberg. They bound and gagged both hostages, Michael on his bed and Patricia on the living-room couch. When night fell, Gretzler shot Michael in the head, muffling the gun with a pillow. He then shot Patricia, who was entirely covered by a blanket. Steelman took the gun and fired one more shot into her body, to make certain she was dead. The two then wiped down the condominium in an attempt to eliminate their fingerprints, gathered together credit cards, checks, a camera and other items belonging

to the Sandbergs, and drove away in the couple's car.

They went to the place where they had arranged to meet acquaintances with whom they planned to drive to California. The only person at the meeting-place was Donald Scott, and the three set off together. Scott knew that he was riding in a stolen car, and he testified that he saw Steelman pay for motel rooms and automobile service with Michael Sandberg's American Express Card. However, Scott apparently was unaware of his companions' other crimes. He had been told by them that he was free to leave them if things became "too much" for him. Scott did leave when Gretzler and Steelman stopped for gas in Pine Valley, California. The two continued to Lodi, California, where they entered the home of the Walter Parkin family and took as hostages all present, as well as others who arrived later. Gretzler and Steelman forced Parkin to open the safe in his nearby store and stole between $3,000 and $4,000, of which Gretzler's share was about half. Afterwards, Gretzler shot to death seven adults, whom he had previously bound and gagged. He went to a bedroom where Steelman had pulled a blanket over the heads of two sleeping children, shot one of them to death and waited while Steelman shot the second.

On 8 November 1973, California police arrested Gretzler and Steelman as suspects in the Parkin homicides. In addition the two were named in Arizona warrants for crimes committed in Maricopa County. Gretzler was incarcerated in Stockton, California, the county seat of San Joaquin County, where the Parkin crimes were committed. He was appointed a lawyer, George Dedekam. On 9 November, California and Arizona authorities began intensive questioning of both suspects.

It was only after Gretzler and Steelman were arrested that the Sandberg murders were discovered. California authorities notified Pima County that the two had been driving a car registered to Michael Sand-

berg. Tucson police then went to the Sandberg home, where they found the couple's bodies and lifted fingerprints later determined to be those of Gretzler and Steelman. While in custody in California, Gretzler confessed to the murders of Michael and Patricia Sandberg.

On 6 June 1974, Gretzler pleaded guilty to nine counts of first degree murder for the nine California killings. A month later, judgment was pronounced in accordance with his plea, and he was sentenced to nine concurrent life sentences. Arrest warrants pursuant to Pima County indictments based on the Armstrong and Sandberg crimes were served on 17 September 1974. Gretzler was booked into Pima County Jail on 18 September 1974 and he was arraigned on 25 September 1974. Various trial dates were set and continued, and Gretzler was finally brought to trial on 14 October 1975.[2]

The jury found Gretzler guilty of all charges. After an aggravation-mitigation hearing pursuant to A.R.S. § 13–454, the court, on 15 November 1976, sentenced Gretzler to death for each of the two murders. Gretzler appeals.

## CHALLENGES TO THE GRAND JURY

On 16 November 1973, a Pima County grand jury heard evidence concerning the crimes at issue here. The jury unanimously voted true bills resulting in indictments against Gretzler and Steelman for burglary, robbery, kidnapping for robbery with a gun, robbery with a gun, and two counts of first degree murder. Defendant claims that the trial court erred in denying several motions to dismiss these grand jury indictments.

a. May a prosecutor who observes part of the police investigation in a case conduct grand jury proceedings concerning that case?

William Stevens, the prosecutor who presented the State's evidence to the grand jury, was present for about an hour while

---

2. Neither Gretzler nor Steelman has ever been prosecuted for any crime committed in Maricopa County.

police conducted their investigation of the Sandbergs' condominium. Stevens did not direct that investigation, and he did not touch, take, or mark any evidence. Stevens did not testify before the grand jury or at trial. Gretzler contends that Stevens as a witness, should not have prosecuted a case before the grand jury and that his doing so offends due process. We do not agree.

Our Court of Appeals has held that a prosecutor who was present when a drug raid was made on the home of the defendant could properly conduct the grand jury hearing in the case:

> "While he could not testify as a witness and then act as the prosecutor at the grand jury proceedings, the mere fact that the prosecutor witnessed some of the events does not disqualify him from acting as a prosecutor as long as he limits himself to that role only." *State v. Steele*, 23 Ariz.App. 73, 77, 530 P.2d 919, 923 (1975).

■ In the instant case, the prosecutor was merely present while others were obtaining evidence. Where a prosecutor limits himself to only one role, his having observed part of the police investigation will not disqualify him from appearing before the grand jury in the role of a prosecutor. *Steele*, supra. We find no error.

b. May prosecutors who are not presenting evidence attend grand jury proceedings?

Gretzler also contends that it was a violation of due process and Rule 12.5, Arizona Rules of Criminal Procedure, 17 A.R.S., for three Pima County prosecutors who did not actually present evidence to be present in the grand jury room. All three were authorized deputies of the Pima County Attorney.

■ Rule 12.5, supra, lists the persons who may attend grand jury sessions:

> "No person other than the witness under examination, counsel for the witness if the witness is a person under investigation by the grand jury, prosecutors authorized to present evidence to the grand jury, the reporter, and the interpreter, if any, shall be present during sessions of the grand jury. * * * "

Rule 12.5 uses the plural form of "prosecutors," as opposed to the singular "witness under examination," "interpreter," and "reporter." We believe that the rule itself contemplates that more than one prosecutor may be present. This is in conformity with the general rule that

> "[t]he right of the prosecuting attorney to appear and assist in the grand jury investigation usually embraces assistants, deputies, and special assistants duly authorized to assist the prosecuting attorney in the performance of his duties." 38 Am.Jur.2d, Grand Jury, § 35 at 980. See *Commonwealth v. Favulli*, 352 Mass. 95, 224 N.E.2d 422 (1967); *Franklin v. State*, 89 Nev. 382, 513 P.2d 1252 (1973); *Berard v. Moeykens*, 132 Vt. 597, 326 A.2d 166 (1974).

We find no error.

c. Was the grand jury tainted by pretrial publicity?

Gretzler also contends that the grand jury members were prejudiced by news media accounts of the Gretzler-Steelman cases.

■ The ultimate question in cases where it is alleged that a grand jury is tainted is whether each "juror can base his decision solely on the evidence presented to him and the law." *State v. Salazar*, 27 Ariz.App. 620, 624, 557 P.2d 552, 556 (1976). The record indicates that the jurors were instructed as to the need for impartiality. Just prior to presenting the Sandberg case, Stevens admonished the jurors at length that they must excuse themselves if they could not decide the case solely on the evidence and without considering anything they might have learned from the news media. All the jurors agreed that they would confine their deliberations to the facts before them. There is no evidence before this court to indicate that any of the grand jurors based their decisions on evidence other than the evidence presented. We find no error.

d. Were the indictments defective?

On 21 March 1975, Gretzler moved that the murder indictment should be dismissed because the grand jury was not informed that the State intended to seek a death penalty. At the hearing on these motions, Gretzler also argued that the indictment was vague and ambiguous.

Rule 12.9(b), Arizona Rules of Criminal Procedure, 17 A.R.S., in effect at the time, provided that any challenge to the grand jury proceedings must be made within ten days after the grand jury transcript and minutes were filed. The present rule requires that the challenge be made within twenty-five days. Rule 12.9(b), Arizona Rules of Criminal Procedure, 17 A.R.S., as amended 7 May 1975. The transcripts and minutes in the instant case were filed on 17 November 1973, and the motion to dismiss the indictment was not raised until six months after the filing.

■ The trial judge denied the defendant's motion because it was untimely, *State v. Lopez*, 27 Ariz.App. 408, 555 P.2d 667 (1976), and because he found the indictment adequate under Arizona law. Since the challenge to the grand jury was not timely, we need go no further. We find no error.

## EXTRADITION AND SPEEDY TRIAL

The right to speedy trial is guaranteed to a criminal defendant. It is, however, fundamentally distinct from the other rights essential to a fair criminal trial, in that there "is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Society is concerned that criminal defendants be tried expeditiously so that dangerous offenders will be quickly restrained from further depredations. Convictions will be more reliable if based on fresh and accurate evidence, and punishments will be more effective if they closely follow culpable acts. *State ex rel. Berger v. Superior Court*, 111 Ariz. 335, 529 P.2d 686 (1974). While an innocent defendant will probably share society's concern for speedy trial, a guilty one is "usually content to allow the trial date to be continued until such time as the witnesses have * * * disappeared, the passions of the victims have cooled, and the zeal of the prosecutor has been dampened." *Berger*, supra, 111 Ariz. at 339, 529 P.2d at 690.

Gretzler contends that Arizona's speedy trial provision as set forth in Rule 8 of the Arizona Rules of Criminal Procedure, 17 A.R.S.,[3] was violated, as well as his federal constitutional right to a speedy trial.

a. Was extradition faulty because of alleged constitutional defects in Rule 8.3 of the Arizona Rules of Criminal Procedure, 17 A.R.S.?

On 19 November 1973, Detective Larry Hust of the Tucson Police Department traveled to California where he filed warrants based on the 16 November indictments against Gretzler with the San Joaquin Sheriff's Department. He personally apprised Gretzler of the Pima County charges pending against him: "I * * * showed him the charges left with the San Joaquin County Jail as a hold placed against him." Gretzler was convicted in California and sentenced on 8 July 1974. He was then extradited by Arizona and taken into custody by Arizona authorities on 17 September 1974.

■ Rule 8.3(a) and (b), supra, provides for notice of detainer to persons held in the state, but not to persons held without the state. According to Gretzler, Rule 8.3 violates equal protection principles guaranteed by the Constitution of the United States because it provides in-state prisoners with notice of detainers filed against them, while out-of-state prisoners are given no such notice. Rule 8.3(a), supra, however, must be read in light of the Interstate Agreement on Detainers to which both California and

---

**3.** Citations to various portions of Rule 8 are as the rule existed prior to amendments of 7 May 1975, effective 1 August 1975.

Arizona are signatories. A.R.S. § 31–481 (Title 31, Ch. 3, Article 6, Agreement on Detainers); West's Ann.Cal.Pen.Code § 1389. A.R.S. § 31–481, Art. III(c) reads as follows:

> "The warden, commissioner of corrections, or other official having custody of the prisoner shall promptly inform him of the source and contents of any detainer lodged against him and shall also inform him of his right to make a request for final disposition of the indictment, information or complaint on which the detainer is based."

Gretzler does not suggest that the above procedure was not, in fact, followed in his case. In addition, as we have noted, Detective Hust testified that he personally notified the defendant of the charges on which the instant prosecution was based within three days of the return of the indictments by a Pima County grand jury. We find no error.

b. Was the time limit from arraignment to trial violated?

Gretzler submits that the trial court erred in denying his motions to dismiss for violation of Arizona's Rule 8.2(a) and 8.2(b), Arizona Rules of Criminal Procedure, 17 A.R.S. Rule 8.2(a) provides that a defendant must be tried within 150 days from issuance of the warrant, and Rule 8.2(b) provides the defendant must be tried within ninety days from his initial appearance or sixty days from arraignment, whichever is the lesser.

Gretzler's reliance upon Rule 8.2 is misplaced. Since Gretzler was being held by California authorities, Rule 8.3(a) Arizona Rules of Criminal Procedure, 17 A.R.S., not Rule 8.2, applies. Rule 8.3(a) provides that a person must be brought to trial within ninety days from the date he has been delivered into the custody of the appropriate authorities of this State. In computing this time, excluded periods are allowed by Rule 8.4 and 8.5 Arizona Rules of Criminal Procedure, 17 A.R.S. Gretzler was taken into custody by Pima County authorities on 17 September 1974. If there were no excluded periods or valid continuances, 16 December 1974 would have been the ninetieth day.

On 21 November 1974, the defense filed a motion under Rule 11, Arizona Rules of Criminal Procedure, 17 A.R.S. The resulting examinations and hearings as to Gretzler's competency for trial lasted until 11 February 1975, when he was found competent by the court. The delay from 22 November until 11 February is excluded time under Rule 8.4(a), since "filing of the motion under Rule 11 effectively stops or suspends the trial of the defendant until his mental competency is established." *State v. Landrum,* 112 Ariz. 555, 560, 544 P.2d 664, 669 (1976). See also *State v. Ceja,* 113 Ariz. 39, 546 P.2d 6 (1976); *Berger v. Rozar,* 112 Ariz. 62, 537 P.2d 932 (1975).

On 11 February 1975, Gretzler moved for suppression of all statements made by him. On 18 February, the court reset trial for 18 March 1975, to allow for the resolution of this motion. On 14 March, Gretzler filed a motion for change of venue and a hearing under *State v. Dessureault,* 104 Ariz. 380, 453 P.2d 951 (1969), cert. denied 397 U.S. 965, 90 S.Ct. 1000, 25 L.Ed.2d 257 (1970). The court set the venue hearing for 21 March, took the motion to suppress under advisement, and set the Dessureault hearing for not less than two days prior to trial. Because these matters could not be resolved prior to 18 March, that trial date was vacated and the matter continued subject to call. Defense counsel stated that it "was not possible" to have his motions "heard prior to the 18th," but he indicated that he was not surrendering his right to object to any speedy trial violation.

On 9 June, the trial court granted the motion for the change of venue. On 10 June, the State moved that a trial date be set within two weeks. Defense counsel opposed the motion, arguing he had further preparation to do, and requested a September trial date. On 16 July 1975, the trial court denied defendant's motion to suppress and set trial for 2 September.

Trial did not commence on 2 September because the defense filed fourteen motions just prior to that date. One motion was for

certain transcripts; the trial court granted the motion and continued the trial to 29 September to allow the transcripts to be prepared, the other defense motions to be resolved, and a Dessureault hearing to be had. The defense at this point was still emphasizing its need for more time. The State again indicated it was ready for trial and protested the continuance. For various reasons, primarily because requested transcripts could not be available to the defense until 22 September, a week before the 29 September trial date, the defense asked for one more continuance. Trial was then set for 14 October 1975, and jury selection began on that day.

Our rule reads:

"The following periods shall be excluded from the computation of the time limits set forth in Rules 8.2 and 8.3:

a. Delays occasioned by or on behalf of the defendant, including, but not limited to, delays caused by an examination and hearing to determine competency, the defendant's absence or incompetence, or his inability to be arrested or taken into custody in Arizona." Rule 8.4(a), supra.

■ Though he urged the continuances that were granted, Gretzler now protests that the continuances were improper. A defendant may not obtain a continuance and then assert, on appeal, failure to comply with the rule as ground for retrial. See *State v. Stoneman,* 115 Ariz. 594, 566 P.2d 1340 (1977); *State v. Barnett,* 112 Ariz. 210, 540 P.2d 682 (1975); *State v. Armenta,* 25 Ariz.App. 62, 540 P.2d 1281 (1975). The continuances herein were obtained by Gretzler as a result of the motions he was entitled in law to make and were "on behalf of the defendant." Rule 8.4(a), supra. We find no Rule 8 speedy trial violation.

We must comment, however, on the delay in bringing this matter to trial. We do not criticize the prosecutor who continuously urged for an early trial. We do feel, however, that the court was lax in not insisting that the defendant, as well as the State, prepare for trial expeditiously. Admittedly, some delay was necessary because of the

complex nature of the case, but a review of the record leads us to believe that the trial court did not adequately protect society's interest in a prompt determination of the accused's guilt or innocence.

c. Was the statutory limit of 150 days from issuance of a warrant to trial violated?

Defendant contends that, pursuant to Rule 8.2(a), Arizona Rule of Criminal Procedure, 17 A.R.S., every accused must be tried "within 150 days of the issuance of the warrant." The indictments on which the instant prosecution is based were issued on 16 November 1973. Three days later, Detective Larry Hust left warrants resulting from these indictments "with San Joaquin County Jail as a hold placed against Gretzler." Hust personally informed Gretzler of the Pima County charges. Gretzler was not tried until October of 1975.

■ As noted above, Rule 8.2(a), which requires a trial within 150 days of the issuance of the warrant, does not apply to defendants being held without the State when the warrant is issued. Rule 8.3(a), Arizona Rules of Criminal Procedure, 17 A.R.S. We find no violation of Rule 8.2(a).

■ It is contented, however, and we agree, that incarceration in another jurisdiction does not abrogate the State's duty to seek an early determination of the charges against the defendant. Our rules provide that within

"90 days after receipt of a written request from any person charged with a crime and incarcerated without the state, or within a reasonable time after otherwise learning of such person's incarceration without the state, the prosecutor shall take action as required by law to obtain such person's presence for trial." Rule 8.3(a), Arizona Rules of Criminal Procedure, 17 A.R.S.

■ In November of 1973, evidence was presented to the Pima County grand jury which indicated Gretzler and the California authorities were notified and a "hold" placed on Gretzler. The record does not

contain any evidence that Gretzler at any time requested a transfer to Arizona for trial. Neither does the record indicate that Arizona was less than diligent in obtaining custody of Gretzler for trial. The delay complained of resulted from California's exercising its right to try and convict Gretzler before releasing him to Arizona. The Arizona authorities did not procrastinate. As soon as it became possible to obtain custody of Gretzler, the Arizona authorities moved to bring him to Arizona for trial. The time Gretzler was in California was excluded from computation of speedy trial limits because the delay was caused by the defendant's "inability to be arrested or taken into custody in Arizona." Rule 8.4(a), Arizona Rules of Criminal Procedure, 17 A.R.S. We find no error.

d. Was the defendant denied his federal constitutional right to a speedy trial?

On appeal, the defendant asserts that he was severely prejudiced by violation of his federal constitutional right to speedy trial. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

*Barker v. Wingo*, supra, sets forth the factors that must be weighed in determining whether federal speedy trial rights have been violated: (1) length of delay, (2) reasons for delay, (3) defendant's assertion of his right, and (4) prejudice cause to the defendant. See *State v. Soto*, 117 Ariz. 345, 572 P.2d 1183 (1977).

Of all these factors, the length of delay weighs least in the balance. *Barker v. Wingo*, supra. It serves primarily to trigger analysis. *State v. Wright*, 113 Ariz. 313, 553 P.2d 667 (1976). As our discussion of our speedy trial rules indicates, the reasons for the delay were the voluminous defense motions and the unavailability of Gretzler due to his California charges. As in *Barker v. Wingo*, supra, the record here "strongly suggests that while he hoped to take advantage of the delay * * * and thereby obtain a dismissal of the charges, [the defendant] definitely did not want to be tried." 407 U.S. at 535, 92 S.Ct. at 2194, 33 L.Ed.2d at 119. Two weeks before trial,

Gretzler was still seeking continuances while the prosecution was urging that a trial date be set. There was no genuine demand that trial begin.

Gretzler contends, however, that he was prejudiced by the delay, in that psychiatrists who examined him in Arizona could not establish his state of mind at the time of the Tucson crimes. We do not find prejudice in this regard. The California psychologists who examined him within a short time after the crimes were in substantial agreement with those who examined him in Arizona.

Gretzler also claims that his California counsel, George Dedekam, died before trial and might have aided his Arizona defense. Mr. Dedekam was available to the defense for at least two months after Gretzler was brought to Arizona. Arizona counsel was granted funds to be used to go to California to talk with Dedekam, and he spent those funds.

 Finally, Gretzler argues that a witness, Michael Marsh, became unavailable through passage of time. Again, defense counsel in fact talked with his witness before he dropped out of sight. Counsel made no effort to record his testimony in any way and made no showing of how testimony Marsh would have given at trial would have aided the defense. The mere assertion that a witness was not available at time of trial "is insufficient to show that a denial of due process has occurred." *State v. Torres*, 116 Ariz. 377, 379, 569 P.2d 807, 809 (1977). See also *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). We find no federal speedy trial violation.

## CONSOLIDATION AND SEVERANCE

When Gretzler and Steelman were returned to Arizona for trial, the Sandberg murders and the Armstrong kidnapping were filed as separate cases with Gretzler and Steelman as co-defendants in each of the two cases. Steelman and the State entered into an agreement to sever the trial of Steelman from Gretzler and to consolidate the Sandberg and Armstrong cases.

Neither Gretzler nor his attorney participated in this agreement, and Gretzler opposed both the severance of the defendants and the consolidation of the cases. The court granted the motions to consolidate the murder and kidnapping trials and to sever the trial of Steelman and Gretzler.

a. Did the trial court abuse its discretion in ordering that Gretzler and Steelman should be tried separately?

Rule 13.4(a) of the Arizona Rules of Criminal Procedure, 17 A.R.S., states that "the court may on its own initiative, and shall on motion of a party," order severance when it "is necessary to promote a fair determination of the guilt or innocence of any defendant." The rule does not suggest that the co-defendant must agree to the severance, and we do not think that such agreement is required. Also, it would appear that consolidation would have been prejudicial under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). Bruton held that admission of a non-testifying co-defendant's confession may violate a defendant's Sixth Amendment right of confrontation. Gretzler's counsel stated to the trial court that, because · of the co-perpetrator's voluminous statements to the police, "there was * * as large a Bruton problem as I have ever seen in any case at any time." The court followed Rule 13.4(a) and there was no prejudice to Gretzler. We find no error.

b. Did the trial court abuse its discretion in consolidating the Armstrong and Sandberg crimes for trial?

The defense also objected to the trial court's consolidating the Sandberg and Armstrong cases. Our rules provide:

"c. Consolidation. If such offenses or such defendants are charged in separate proceedings, they may be joined in whole or in part by the court or upon motion of either party, provided that the ends of justice will not be defeated thereby." Rule 13.3(c), Arizona Rules of Criminal Procedure, 17 A.R.S.

As we have stated:

"The appellant must demonstrate a clear abuse of discretion with respect to the

trial court's decision to join the offenses, 'based on the showing at the time the motion is made and not what ultimately transpires at the trial.' (citation omitted)" *State v. Dale*, 113 Ariz. 212, 215, 550 P.2d 83, 86 (1976).

It is evident that the Armstrong and Sandberg crimes were both part of Gretzler's and Steelman's continuing effort to get out of Tucson without attracting police attention following the murder of Gilbert Sierra. Having no car they kidnapped Armstrong to get his Pontiac Firebird. Since Armstrong escaped them and could give police descriptions of his captors and of his stolen vehicle, they had to dispose of the Pontiac immediately. They did so ·by parking it inconspicuously in the lot of the Sandbergs' condominium, where Michael Sandberg was washing his own car. They forced Sandberg into his home at gunpoint, and, after changing their appearance, murdering the Sandbergs and stealing their belongings, escaped Arizona in the couple's Datson. It was the manager of the Sandbergs' condominium who first discovered Armstrong's car and reported it to the police.

The Armstrong and Sandberg crimes were "connected together in their commission" and were a "part of a common scheme or plan." The offenses would have been properly joined pursuant to Rule 13.3(a)(2) and (3), Arizona Rules of Criminal Procedure, 17 A.R.S., and were properly consolidated pursuant to Rule 13.3(c), supra.

## DEFENDANT'S COMPETENCE TO STAND TRIAL

On 21 November 1974, defense counsel filed a motion requesting examinations and a hearing into Gretzler's competency to stand trial, pursuant to Rule 11, Arizona Rules of Criminal Procedure, 17 A.R.S. Rule .11.1 states:

"A person shall not be tried * * * while, as a result of a mental illness or defect, he is unable to understand the proceedings against him or to assist in his own defense."

The court granted the motion and appointed two psychiatrists to examine the defendant: Dr. Alan Beigel, requested by the State, and Dr. David B. Gurland, requested by the defense. The Rule 11 hearing was held on 11 February 1975. At the hearing, both experts testified that Gretzler was suffering from no thought disorders and that he had good recall of the events which occurred in the autumn of 1973. They agreed that he was able to understand the proceedings against him and could aid in his defense. Both psychiatrists rejected defense counsel's suggestion that Gretzler's recall of the period at issue here was greatly damaged by amphetamines he was supposed to have taken at the time. They stated that, while there were some gaps in the defendant's memory, impairment was at worst "moderate." We have stated that examinations into competency to stand trial focus

> "on an extremely narrow issue: whether whatever is afflicting the defendant has so affected his present capacity that he is unable to appreciate the nature of the proceedings or to assist his counsel in conducting his defense." *State v. Steelman*, 120 Ariz. 301, 315, 585 P.2d 1213, 1227 (1978).

In the instant case, the experts agreed that Gretzler was able to understand the nature of the proceedings against him and to aid in his defense. We find that the trial court's decision that Gretzler was competent to stand trial was supported by the evidence.

## OBJECTIONS TO IDENTIFICATION WITNESSES

Gretzler moved, pursuant to *State v. Dessureault*, supra, to preclude the identification of Gretzler by Donald Scott and Vincent Armstrong because of unduly suggestive police procedures. After hearing, the court denied the motions to suppress as to both Scott and Armstrong. On appeal, Gretzler contends the denial of these motions was error.

### a. Donald Scott

At the Dessureault hearing, Donald Scott described himself as a "fellow street person" with Gretzler and Steelman. He knew them as "Doug" and "Bill" during the time they lived in Tucson. One night he shared a "crash pad" with them, and he spent two-and-a-half days with them in the Sandbergs' car en route to California. While he had been previously shown police photographs of Gretzler, the trial court ruled that his identification of Gretzler was based on an independent recollection and not on the police photographs. The defense did not object to this ruling. We agree with the trial court. We find no error.

### b. Vincent Armstrong

Vincent Armstrong testified that he stopped to pick up Gretzler and Steelman as they were standing, at midday, by the side of the road and that he spent about thirty minutes with them before he escaped. Gretzler sat next to Armstrong, in the front seat, while Steelman, in back, held a gun to Armstrong's ribs. When Armstrong claimed to be too nervous to drive, he stopped the car so that Gretzler could get out, walk around the front of the car and take over the wheel.

At the hearing, Armstrong testified that between his kidnapping and that day, he had seen Gretzler only once, when he happened to be watching a television news story concerning the California murders. Recognizing his captors, he notified Tucson police that it was Gretzler and Steelman who had kidnapped him. Prior to that time, he had worked with the police to produce composite drawings of his then unidentified assailants. At Steelman's trial, he again saw the Gretzler composite. At no time was Armstrong shown mug shots or a police line-up.

On the eve of the Dessureault hearing, Armstrong had the following exchange with a Tucson policeman:

> "ARMSTRONG: I just asked him—I said, 'I imagine—I imagine Gretzler looks different now.' And he says, 'He's been cleaned up.'"

Immediately prior to the Dessureault hearing, Armstrong caught sight of Gretzler coming out of the courtroom after another proceeding. At the Dessureault hearing, Armstrong identified Gretzler, testifying that the defendant's hair had been longer and blonder at the time of the kidnapping. He also noted that Gretzler had not worn a mustache at that time, though he wore one at the hearing. After Armstrong's testimony at the Dessureault hearing, the defense moved that his identification of Gretzler be precluded at trial because it was tainted by the comment, "He's been cleaned up," and by Armstrong's glimpse of Gretzler just before the Dessureault hearing. The court disagreed.

Our review of the evidence leads us to concur with the trial court that Armstrong's in-court identification of Gretzler was based on his own experience and independent recollection. We find no error. *State v. McGill*, 119 Ariz. 329, 580 P.2d 1183 (1978); *State v. Ware*, 113 Ariz. 340, 554 P.2d 1267 (1976).

## DISCLOSURE

The defendant contends that, in several instances, the Pima County Attorney's Office and the trial court were "guilty of withholding information which was valuable and in some cases essential to the defense of the matter."

Rule 15, Arizona Rules of Criminal Procedure, 17 A.R.S., governs discovery in criminal prosecutions. Section 15.1 of the rule specifically sets forth the obligations of the prosecutor to make disclosure to the defendant. As noted in the commentary to the rule, subsection 15.1(a)(7) clarifies "the prosecutor's constitutional obligations under *Brady v. State of Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)." Brady held that when the defense requests evidence favorable to the accused, the prosecutor must produce all information in his possession that is "material either to guilt or to punishment." 373 U.S. at 87, 83 S.Ct. at 1197, 10 L.Ed.2d at 218. Arizona's Rule 15 reaches beyond *Brady* as to what must be disclosed and it also requires the State to make disclosure regardless of whether there is a defense request. For failure to comply with Rule 15.1, the rules provide:

"If at any time * * * a party has failed to comply with * * * this rule or any order issued pursuant thereto, the court may impose any sanction which it finds just under the circumstances * * ." Rule 15.7, Arizona Rules of Criminal Procedure, 17 A.R.S.

a. Background information on prospective jurors.

Prior to jury selection, the prosecutor and the defense counsel stipulated that the prosecutor would provide the defense with any information he had concerning the thirty-six individuals from which the ultimate jury would be selected. No such information was provided. Shortly before trial, the defense made a motion that the State disclose this material. The prosecutor stated to the court that, while he had requested a check on the thirty-six jurors, he had received no information. The prosecutor also stated he had directed the State's investigator to share his juror findings with the defense. The prosecutor participated in jury selection without any information from his investigator. After jury selection, the prosecutor stated that upon checking with the investigator, he found that a "background check" had been done on the thirty-six jurors but that there was nothing returned one way or the other. The investigator gave him no report, and he had nothing to pass on to the defense.

We might rule differently if the prosecutor was using this procedure in order to withhold from the defense useful information possessed by the State's investigator. Our reading of the record leads us to conclude, as did the trial court, that there was no information to be passed on to the defense. We find no error.

b. Did the prosecutor or court deny the defendant other Rule 15 or *Brady* information?

In addition to the juror background information, Gretzler contends on appeal that

certain other materials and "valuable information" were withheld by the State and trial court.

We have reviewed the portions of the record designated in support of this contention and in almost every instance the record to which he refers indicates that the requested information was delivered. For example, Gretzler alleges that the prosecutor refused to disclose the addresses of potential witnesses Marsh, McPeak, and Scott. The record reveals that the prosecutor agreed from the first to share this information when his office had the addresses and that he in fact did so. The defendant alleges that he was denied information from Pinal County, Arizona, police reports and from Stanislaus County, California, police reports. The record shows that the prosecution disclosed all Gretzler-Steelman police reports in its possession, as well as reports it obtained on defense request. The Pinal and Stanislaus County reports were delivered to the defense on 28 March 1975.

Gretzler also alleges that there was not adequate disclosure of the testimony of witnesses in the Steelman trial. The record shows that the prosecutor provided the defense with transcripts of all State witnesses in the Steelman trial and agreed additionally to transcribe any material the prosecution believed to be required by Brady, supra. At all times, the entire Steelman trial record was available for the defense.

 Gretzler further alleges that the State withheld its responses to motions made by co-defendant Steelman. These responses were deemed by the trial court, under its Rule 15.1(e) discretion, to be necessary to the Gretzler defense. The record shows that some of this material failed to reach the defense promptly, through no fault of the State. Gretzler received the material in time to use it for his defense. We find no error.

Finally Gretzler contends that the State withheld information concerning an organized crime "family" named Smaldone, which was supposed to exist in Denver, Colorado. Gretzler had suggested in a statement to police that he was threatened by Steelman with retaliation by the Smaldones if he did not commit the crimes in question. Gretzler also suggests that prior to sentencing the State had proof that the Smaldone family did, in fact, exist. The record before this court does not substantiate these allegations. We find no error.

## CLAIMS CONCERNING THE JURY

### a. Excessive publicity

Both Steelman and Gretzler filed a motion for change of venue based upon prejudicial pretrial publicity which the court granted. In order to protect the new venues from undue publicity, they were kept secret from all but the parties and court officials until trial began. Steelman was tried first, in St. Johns, Apache County. Gretzler was tried in Prescott, Yavapai County.

The distance between Tucson, the county seat of Pima County, and Prescott, the county seat of Yavapai County, is 212 miles. More importantly, the two counties are served by different metropolitan daily newspapers. Over a year had elapsed between the first Pima County newspaper stories of the crimes and the beginning of trial in Prescott on 14 October 1975. Prior to trial, one hundred prospective jurors were asked to fill out extensive questionnaires which both the State and defense helped to write. The trial judge then orally questioned each of these persons at length, supplementing his own questions with those suggested by the attorneys. Occasionally, the attorneys themselves asked questions. The original group of one hundred was narrowed to a panel of thirty-six, from which sixteen trial jurors were ultimately chosen.

No one on the thirty-six member panel indicated a knowledge of the instant case. No one knew that Steelman's trial had occurred. One person, not an ultimate juror, overheard in a coffee shop that Gretzler had been given a life sentence in California. Four panel members knew that he had been extradited from California for the present trial. Two individuals recalled Steelman's name, but knew nothing about him; and

one knew that he had been accused of murder, but not that he had been tried.

It would appear that this panel had substantially less knowledge of the case and the defendant than is required for a finding of jury taint. Neither prior knowledge of the case nor an opinion concerning the defendant's guilt will disqualify a juror unless there is evidence that is he unable to set aside such knowledge or opinion in evaluating the evidence presented at trial. *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *State v. Smith*, 116 Ariz. 387, 569 P.2d 817 (1977); *State v. Endreson*, 109 Ariz. 117, 506 P.2d 248 (1973) (half of trial jury had knowledge of the case); *State v. Schmid*, 109 Ariz. 349, 509 P.2d 619 (1973) (all jurors had knowledge of the case). We find no error.

b. Was the jury panel unconstitutionally selected?

On 22 October 1975, Gretzler moved to quash both the panel of one hundred jurors provided by Yavapai County and the panel of thirty-six narrowed from the original group through voir dire, as being unrepresentative of the community from which they were drawn.

The statistical information submitted by Gretzler indicates that Yavapai County had an estimated population of 50,700 in 1976. The figures show that 87% of the total population is "Anglo-American," while the remainder is "Spanish-American," "Indian," "Negro," or "Other." Gretzler contends that there should have been thirteen Spanish-Americans instead of two.

In *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975), the United States Supreme Court held that petit juries must be drawn from a source fairly representative of the community, and that the defendant need not be a member of the group allegedly excluded in order to raise this question. The United States Supreme Court has also set forth the elements a challenger must show to establish a prima facie violation of the fair cross-section requirement. These are:

"(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 587 (1979).

We note that jurors in Arizona were selected at that time from voter registration lists as provided in A.R.S. § 21–301(A). The use of voter registration lists as a sole source of jurors is not constitutionally infirm absent a showing of systematic exclusion in the compiling of such lists:

"* * * we note that even if defendant does establish that blacks do not register in proportion to their share of the community population, which is all he seeks to show, he will have failed to demonstrate any systematic exclusion of blacks for jury duty. Although the registered voters list from which jurors are drawn may not parallel exactly the proportion of each minority within the community, that in no way establishes or even demonstrates systematic exclusion. *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). * * *" *State v. Watson*, 114 Ariz. 1, 16, 559 P.2d 121, 136 (1976), cert. denied 430 U.S. 986, 97 S.Ct. 1687, 52 L.Ed.2d 382 (1977). See also *State v. Lee*, 114 Ariz. 101, 559 P.2d 657 (1976); *United States v. James*, 453 F.2d 27 (9th Cir. 1971).

And:

"A defendant is not entitled to a jury which is composed of, with material precision, the exact proportion of his race as exists in the general population. All that is required is a jury selected by a process where the members of his race are not systematically excluded." *State v. Taylor*, 109 Ariz. 267, 272, 508 P.2d 731, 736 (1973).

Even though there may have been underrepresentation as to this particular jury venire, we do not find this underrepre-

sentation is due to systematic exclusion in the jury selection process. We find no error.

### c. Did the trial court abuse its discretion as to voir dire?

█ On 13 October 1975, the defense filed a motion to "allow defense counsel to conduct a full blown voir dire examination of the jury panel." The trial court denied this motion. A written questionnaire consisting of eighty-four questions was jointly formulated by the prosecutor, defense attorney, and trial judge. Each of the one hundred original jurors answered the questionnaire. Then each of the one hundred was questioned outside the presence of the other jurors by the trial judge. The defense attorney and prosecutor asked questions when they deemed it necessary to do so. Although defense counsel did not conduct voir dire, he actively participated in the questioning of the jurors at each stage. The defense was not foreclosed from asking any relevant questions. See Rule 18.5(d), Arizona Rules of Criminal Procedure, 17 A.R.S.; *State v. Melendez*, 121 Ariz. 1, 588 P.2d 294 (1978). We find no error.

### d. Did the trial court err in limiting the defense to ten peremptory challenges?

On 14 October 1975, the defense filed a motion requesting that it be allowed an unspecified number of peremptory challenges, in addition to the ten specified by Rule 18.4, Arizona Rules of Criminal Procedure, 17 A.R.S. The defense argued that the extra challenges were necessary to vitiate the impact of pretrial publicity on the jury panel. The trial court denied this motion.

█ We have stated above that there was no significant prejudice among potential jurors from any alleged pretrial publicity. The defendant cites no authority for the proposition that the trial court should have granted him more than ten peremptory challenges provided him under Rule 18.4, nor does he suggest any way in which he was damaged by having only ten challenges rather than more. We find no error.

### e. Sequestration of the jury.

On 14 October 1975, the defense moved that the jury be sequestered. This motion was denied by the trial court. Our rule states:

"19.4 Separation and detention of jurors

"The court in its discretion may permit jurors to separate or, on motion of any party, may require them to be sequestered in charge of a proper officer whenever they leave the jury box. The court shall admonish the jurors not to converse among themselves or with anyone else on any subject connected with the trial, or to permit themselves to be exposed to news accounts of the proceeding, or to form or express any opinion thereon until the action is finally submitted to them. If the jurors are permitted to separate, they shall also be admonished not to view the place where the offense allegedly was committed." Rule 19.4, Arizona Rules of Criminal Procedure, 17 A.R.S.

█ Publicity is the chief factor a trial judge should consider when determining whether to sequester a jury. Although the publicity in Pima County was sufficient to convince the trial judge to grant the motions for change of venue, the publicity in Yavapai County was not such that it was necessary to sequester the jury. As we have indicated above, the jury panel had no members who were aware of even the bare facts of the crimes with which Gretzler was charged. The trial court cautioned the jurors at the beginning and end of every session to avoid exposure to news stories or conversations concerning the trial, in accordance with Rule 19.4, supra. After the panel of thirty-six was selected, and before the final twelve were chosen, two members of the jury responded affirmatively to the court's questions as to whether they had heard anything about the case during a week-end recess. The court promptly investigated the kind and extent of their exposure to outside information to the satisfaction of both State and defendant. The publicity was not inflammatory or excessive.

"When * * * publicity is not sensational nor inflammatory, there is no need to sequester the jury particularly when the jury has been cautioned not to read the newspapers, listen to the radio or watch television during the trial and there is no indication that the court's instructions were violated." *Collins v. State*, 589 P.2d 1283, 1291 (Wyo.1979). See also *State v. Richmond*, 112 Ariz. 228, 540 P.2d 700 (1975); *State v. Lippard*, 26 Ariz.App. 417, 549 P.2d 197 (1976); Annotation, 72 A.L.R.3d 100.

Gretzler contends, however, that because the newspapers the jury received were censored, the jury knew this was a sensational case. Just prior to the beginning of trial, the trial court explained to the jurors that they had to forego newspapers and news broadcasts for the duration of the trial. The judge informed them that newspapers in which stories concerning the case were excised would be provided for the jury to read during recesses. Censored newspapers were provided during jury selection as well. Gretzler alleges that these newspapers were themselves prejudicial because the excisions indicated to the jurors the fact that the trial was newsworthy. We do not agree.

■ It is not uncommon to provide censored newspapers and magazines for jurors in a long trial so that they will not, as the trial court put it in this case, "feel totally left out of the news that [is] going on in the world." We believe the court's concern for the jury was commendable, and we do not believe that the excised portions of the newspapers indicated that the trial was more important than the facts presented to the jury would reasonably be expected to indicate. We find no error. See *State v. Braun*, 82 Wash.2d 157, 509 P.2d 742 (1973).

Finally, in his pretrial caution to the jury, the judge made the following statement:

"One of the ways in which a court can insure that jurors don't hear or read anything about the case while they're sitting on the jury is to sequester them, which means to put them in a hotel and not let them go home to their families and go about their daily affairs. But it is not the intention of the court to do that in this particular case. If the court finds that it loses one or two jurors because they aren't following the admonitions of the court in not talking about the case or hearing anything about it or discuss it, it may be that that admonition won't be sufficient, and that it—as to the balance of the jurors that may remain, they would have to be sequestered."

■ Gretzler objected that this statement was a threat which would so intimidate the jurors that they would not dare reveal to the court that they had been exposed to prejudicial statements. Gretzler has shown no instance where a juror was exposed to prejudicial statements. Neither do we believe that jurors are so easily intimidated. The court merely gave them the alternative to sequestration. We find that the statement is a proper admonition of the kind contemplated under Rule 19.4, supra. We find no error.

## ADMISSIBILITY OF DEFENDANT'S CONFESSIONS

On 8 November 1973, at about 10:10 a. m., Gretzler was arrested in a hotel in Sacramento, California, on warrants arising out of the murders that occurred in Maricopa County, Arizona, and San Joaquin County, California. Immediately on arrest he was advised of his *Miranda* rights. The accused was them taken to the Sacramento Police Department where he was strip-searched and again advised of his Fifth and Sixth Amendment rights. He said he understood his rights, but wished to make a statement. Gretzler was questioned two more times by California authorities about the California crimes, always after being advised of his *Miranda* rights. He was also interviewed by two California psychiatrists who later testified as to Gretzler's competency.

The following morning, 9 November, at about 10:00 a. m., the defendant was again advised of his *Miranda* rights. Once more he waived them. He was again interviewed by San Joaquin authorities, this time ac-

companied by Detectives Arellanes and Miller from Maricopa County. During this tape recorded interview, Arellanes made the following comment:

"Okay, Douglas, from what we understand you have been real cooperative with these gentlemen here and you told them—you have gone right down the line and told them everything, right? Okay. We would appreciate it at this time if you would do the same thing with us. Chances are that we may not be able to prosecute you in Arizona."

The questioning was interrupted twice. Once the defendant was taken via elevator to a courtroom in the same building for arraignment, but returned to the interview room because the magistrate was not ready for him. The second time he was taken to the court, arraigned, and appointed a lawyer.

At his Arizona voluntariness hearing, Gretzler testified that during the second elevator ride he had been coerced into admitting the Maricopa County murders:

"My hands were chained to my sides on a chain belt. I was standing in the elevator. It's got two sections, a front like out there (indicating), and the back has a cage. They put you in there and some of the guys in there grabbed me and pressed me up against the wall."

Gretzler also testified that no one ever hit him or otherwise hurt him while he was in custody. The Maricopa detectives testified at the hearing that they had told Gretzler in the elevator that they believed he was lying about the Maricopa crimes, but that there had been no physical harassment of the defendant. Up until this elevator ride, Gretzler maintained that Bob Robbins and Yafah Hacohen, the couple he and Steelman murdered in a Maricopa County trailer park, were, as far as he knew, still alive. While in the elevator, he admitted they were dead and agreed to give Arizona detectives a statement concerning their deaths.

Following his arraignment and the appointment of counsel, the two Maricopa County officers concluded their conversation with Gretzler. The newly appointed lawyer, George Dedekam, was present, as the following excerpt from a tape-recording of the session indicates:

"Detective Ambrose: Defendant Douglas Edward Gretzler. The date 11–9–73. The time is 11:50 hours. Approximately twenty minutes before this interview, another interview was held. This interview was discontinued to take Mr. Gretzler before Municipal Court Judge for his first arraignment. At this Court Attorney George Dedington (sic) was appointed as the attorney of record for Mr. Gretzler.

"Douglas, the reason I put that in the recording—the reason I've advised you and recorded on here that we went to the Court and you were appointed an attorney is because now officially you have an attorney representing you. All right, before we can question you any further we're going to contact your attorney and we're going to talk with him and have you talk with him and advise him that you are going to make further statements to us. Do you understand that?

"GRETZLER: I understand that. Now, I am willing to make a statement, with or without him.

"Q You want to make a statement with or without him; is that correct?

"A Yes, yes.

"Q All right. We're not going to ask you any questions from this point on until we have Mr. Dedekam on the phone or here in person.

"A Right.

"Q You understand that?

"A Yes, I understand that. Can I have these removed, these shackles from my legs?

"Q Beginning to bite in a little bit?

"A Yeah, they hurt. Okay, I think I'll go along with that, okay for now.

"Q The reason we're trying to get ahold of you we brought him down, he was making statements. (Talking to Dedekam)

"DEDEKAM: He indicated that I hadn't told him not to; I didn't have a chance in Court.

"GRETZLER: No, that's all right. I did it wilfully.

"DEDEKAM: Okay, no more statements, then, okay?

"DETECTIVE AMBROSE: And for your information, Mr. Dedekam, there has been no questioning at all. We advised him of this, that he would have to talk with you first.

"DEDEKAM: Seriously, okay? They do not have very many reports at this time, so it'll probably be sometime next week before I come out to see you, because I want to review the reports, before I talk to you okay?

* * * * * *

"DEDEKAM: Okay, now I'll be out to see you. A number of the inmates are going, if they're near or around you, they're going to be wanting to question you.

"GRETZLER: I'm sure, but they're not, I'm in maximum security anyway.

"DEDEKAM: Don't talk. I don't think they would be * * * if they do * *. (GARBLED)

"GRETZLER: I won't say anything.

"DEDEKAM: Then I'll be up to see you, okay?

The interview concluded about noon.

Late that night, Detectives Bunting and Tucker of the Tucson Police Department spoke with the defendant for the first time about the Tucson murders. They told Gretzler they were investigating the Sierra and Sandberg murders and that he would probably be prosecuted for these crimes. At the voluntariness hearing, Bunting testified as follows about this conversation:

"We explained to him that we could not talk to him unless he waived his rights to an attorney.

He explained his attorney advised him not to speak to anybody; that he would like to talk unofficially if he could.

We explained we could not talk unofficially; that anything he said would be used against him, and there was no way we could speak with him unofficially. We explained he had certain rights that we would have to advise him of.

He told us he had been advised of his rights many times, and that he was fully aware of his rights, and that's all he had heard since he was arrested was his rights, and that he was just completely aware of them; that he did not want to make a statement, but he would talk to us verbally.

* * * * * *

"Q What happened next?

"A After I was satisfied in my mind he knew his rights, we went ahead and spoke with him about it first explaining to him that it would be used against him."

Gretzler testified that he understood his statements could be used against him and that he spoke willingly to Bunting and Tucker. This conversation lasted about an hour; no tape recording was done because the defendant did not want the tape recorder running. At the end of the interview, Gretzler said he might be willing the next day to make a tape recording. In Bunting's words: "He wanted time to think about it and [said] to come back."

At about 1 p.m. on 10 November, Detectives Bunting and Tucker returned to talk with Gretzler to see whether he would tape-record a statement about the Tucson crime. He was advised of his rights and agreed to answer questions on tape. In this brief interview, Gretzler admitted his role in the Armstrong kidnapping and told of going to the Sandberg condominium complex afterward. He did not admit that he had entered the Sandberg home or killed the couple.

At 1:30 p.m. the same day, Gretzler was visited by California detectives Ambrose and Wagner, whom he had requested to see. He was advised of his rights and waived them both orally and in writing. It was during the long interview which followed that Gretzler first admitted his active role in the crimes of the preceding weeks; he confessed to the Lodi and Tucson murders. Gretzler made the following statements in waiving his right to counsel:

"Q All right, before we get started I want you to understand that yesterday your attorney talked with you.

"A Yes, he did.

"Q And said certain things to you.

"A Right. He advised me not to say anything.

"Q All right.

"A But I'm waiving those rights, I'm going to.

"Q All right, I'm going to advise you of your rights again, and then you can—

"A Right."

The officer then read the defendant his *Miranda* rights:

"Q I've advised you before of these rights. Do you, do you still understand those rights?

"A Yes, I do.

"Q All right, your attorney is George Dedekam?

"A Yes.

"Q Do you desire to call him at this time or would you like to just—

"A I would like to talk to him later, not at this time, I don't."

Gretzler then signed a waiver form provided by Detective Ambrose:

"DETECTIVE AMBROSE: Q Do you not desire your counsel to be here?

"A I do not, and this is voluntary."

This interview ended at about 5 p. m.

Larry Hust of the Tucson Police Department interviewed Gretzler on 19 November 1973, and Gretzler again reiterated that his statements were made voluntarily and in full knowledge of his rights.

Of the statements outlined above, three were used by the State as trial evidence. The first was the tape recording taken by Detectives Bunting and Tucker on the afternoon of 10 November. In this interview, Gretzler admitted that he had participated in the Armstrong kidnapping and claimed he was outside the Sandberg home while Steelman spent several hours inside. The second confession was made shortly after the first, to California detectives. It was Gretzler's first acknowledgement that he,

himself, had murdered numerous people, including eight of the Lodi victims and both of the Sandbergs. The third statement introduced at trial was Gretzler's 19 November avowal that earlier conversations with the police had been voluntary.

a. Did the evidence before the trial court support a finding that Gretzler's confessions were voluntarily made?

Gretzler moved to suppress all statements made by him to authorities while he was in police custody. A voluntariness hearing was held and ten witnesses, including Gretzler, testified. The trial court listened to all tape recorded statements in their entirety. Following the hearing, the court found that Gretzler was fully advised of his *Miranda* rights and that he knowingly, intelligently and voluntarily waived these rights. Gretzler's motion to suppress was therefore denied. On appeal, Gretzler alleges that the trial court's finding was reversible error because it was unsupported by the evidence. We do not agree.

■ "[C]onfessions are prima facie involuntary and the burden is on the state to show by a preponderance of the evidence that a confession was freely and voluntarily made." *State v. Edwards*, 122 Ariz. 206, 212, 594 P.2d 72, 78 (1979). See also Rule 16.2(b), Arizona Rules of Criminal Procedure, 17 A.R.S.; *State v. Hall*, 120 Ariz. 454, 586 P.2d 1266 (1978). A confession will be found involuntary where the court, considering all the circumstances, determines that one of the following factors exists: (1) impermissible conduct by police, (2) coercive pressures not dispelled, or (3) confession derived directly from prior involuntary statement. *State v. Steelman*, supra, 120 Ariz. at 309, 585 P.2d at 1221. None of these factors exist in this case. Neither is a confession made involuntary by the mere fact that it was made outside the presence of an attorney. *State ex rel. Berger v. Superior Court*, 105 Ariz. 553, 468 P.2d 580 (1970).

"[A] blanket prohibition against the taking of voluntary statements or a perma-

nent immunity from further interrogation, * * * would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests." *Michigan v. Mosley*, 423 U.S. 96, 102, 96 S.Ct. 321, 326, 46 L.Ed.2d 313, 320 (1975). See also *United States v. Rodriguez-Gastelum*, 569 F.2d 482 (9th Cir.), cert. denied 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978).

Gretzler was fully informed of his constitutional right to counsel and right to remain silent as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). There is no question that he understood the rights he was waiving when he confessed to the crimes he had committed in Pima County. .

█ The facts fully support the trial court's finding that the State met its burden of proving Gretzler's statements voluntary. See *State v. Sample*, 107 Ariz. 407, 489 P.2d 44 (1971). There was no error in the denial of defendant's motion to suppress.

b. Was there a violation of defendant's right to counsel, rendering his statements inadmissible?

█ As further grounds for suppression of his California statements, defense counsel argued both at trial and on appeal that Gretzler's right to counsel was violated. He contends that "confessions obtained by Arizona authorities without the benefit of Arizona counsel," must be suppressed. The defense cites no authority to support this view. We find nothing to require that an attorney must be provided by a state to a defendant before that defendant is brought into and within the custody and jurisdiction of that state. Of course, if the defendant asks for an attorney, he may not be questioned until he has one appointed, but an attorney in the state in which he is then in custody will satisfy the requirements of defendant's right to counsel.

█ In the instant case, we note that Gretzler, of his own accord, largely disregarded the advice to remain silent given him by his California attorney. Where waiver of right to counsel in California so unequivocally followed the proper *Miranda* warnings, subsequent statements made in California were not rendered inadmissible by the fact that Gretzler had not yet been appointed Arizona counsel.

c. Did the trial court wrongly limit the defense challenge of voluntariness of certain evidence by not allowing the defense to question its admissibility before the jury?

Gretzler argues on appeal that the trial court prevented him from adequately presenting the issue of voluntariness to the jury. At trial, the State introduced Tucson policeman Larry Hust to lay the foundation for the playing of the tape recording of the 19 November 1973 conversation between Gretzler and Hust. Defense counsel argued that he should be allowed to voir dire Hust as to voluntariness prior to the tape's being played. The judge ruled that, since he had found the statement admissible, it would be played to the jury without prior questioning by the defense. The defense would be allowed to raise the voluntariness issue in its cross-examination of Hust, after the jury had heard the recording. The defense renewed this argument as each Gretzler statement was introduced, and each time it was overruled.

We believe the judge's rulings follow from a correct interpretation of the law concerning the respective roles of judge and jury in weighing voluntariness as set forth by the United States Supreme Court in *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

"The only issue decided in the *Jackson* case is the correct trial procedure when a purported confession is offered and a question is raised as to whether it is voluntary or involuntary. In *Jackson*, the Supreme Court held that when this question is raised the trial judge must first hear the evidence regarding the con-

84

fession outside the presence of the jury. He must then make a definite determination whether the purported confession was voluntary or involuntary. If he determines it was involuntary it may not be admitted in evidence. If he determines it was voluntary, he may admit it for consideration by the jury. He may not submit it to the jury merely upon a finding that there is a conflict in the evidence, without himself first definitely resolving the conflict." *State v. Owen*, 96 Ariz. 274, 275, 394 P.2d 206, 207 (1964). See also Rule 16.2, Arizona Rules of Criminal Procedure, 17 A.R.S.

▮ Once the court has found his statements admissible, a defendant may, of course, present evidence tending to refute the statements' validity. The jury is the ultimate arbiter of voluntariness, and is free, "in effect, [to] disagree with the judge, and reject the confession." *State v. Owen*, supra, 96 Ariz. at 277, 394 P.2d at 208. Once the evidence had been admitted as the result of a hearing outside the presence of the jury, the defendant may not challenge the statement's admissibility before the jury although he may challenge its voluntariness on cross-examination.

d. Did the court's granting the State's motion to prohibit mention of the death penalty unduly limit the defense's arguments on voluntariness?

During a recess before the playing of the Hust tape to the jury, the trial court heard a State motion in limine that there should be no reference at trial to the death penalty. The State argued that punishment is a matter for the judge and should not be considered by the jury in determining guilt or innocence. The motion was opposed by the defense, but was granted by the trial court. On appeal, the defense asserts that the court's ruling was reversible error because it precluded testimony or argument that Gretzler's confession was obtained by threats of capital punishment. In a previous case of this court we stated:

"It appears from the record that the trial court's reason for precluding evidence of

the penalty the witness could have received was to prevent the jury from learning of the penalty the defendants in this case might receive if convicted of first degree murder. Whatever merit this reason may have, it cannot outweigh the right of the defendant to cross-examine the State's major witness on what he expects in return for his testimony. The fact that the witness faced a possible death penalty if he did not testify for the State surely would be a factor if not the factor in the witness's decision to testify. The trial court's refusal to allow inquiry into the penalty the witness would have faced had he not agreed to testify was reversible error." *State v. Morales*, 120 Ariz. 517, 520, 587 P.2d 236, 239 (1978).

In *Morales*, supra, the threat of the death penalty was an inducement for the witness to testify. We held that foreclosing reference to the death penalty was prejudicial to the defense and thus outweighed the policy against allowing punishment to be mentioned before a jury not charged with determining sentence.

▮ In the instant case, the death penalty was not a factor in Gretzler's confession since Gretzler admitted he did not know Arizona had the death penalty. At the voluntariness hearing outside the presence of the jury, Gretzler stated:

"Q Do you understand now what my questions are trying to find out?

"A No.

"Q The 19th was the day you gave the statement to Mr. Hust. You remember Mr. Hust with the very short haircut that came in and testified?

"A Yes.

"Q You remember giving the statement to him?

"A Yeah.

"Q That was the last statement that you gave that's been introduced into this proceeding. Is that your recollection?

"A Yeah. I think so.

"Q Prior to that, did you know that life imprisonment was the maximum penalty for the charges against you in California?

"A I guess I figured it probably was, but I wasn't sure.

"Q Between the 8th and 19th when you gave the statement to Hust, did you ever know what the penalty was for the Arizona charges?

"A For the Arizona charges?

"Q Yes, what the maximum was for those charges?

"A No, not for sure.

"Q What did you think, if you thought about it at all? Did you?

"A I figured probably—I don't know, twenty years, I don't know.

"Q Did you think about it?

"A No, not really."

We find no error.

## OBJECTIONS TO EVIDENTIARY RULINGS

a. Were defendant's prior convictions admissible for impeachment purposes?

 On appeal, Gretzler renews his trial objection to a ruling that his California convictions, based upon crimes that occurred after the crimes for which he was being tried, could be used to impeach him if he testified in his own behalf. Impeachment goes to the credibility of a witness. Conviction of a felony is material to a witness's credibility. A witness may be impeached by a prior felony conviction even if the witness is also the defendant and the prior felony conviction was for a crime that occurred after the crime for which the witness is being tried as a defendant. The fact that its application may have prevented Gretzler from taking the stand is not material. *Spencer v. Texas*, 385 U.S 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); *State v. Myers*, 117 Ariz. 79, 570 P.2d 1252 (1977), cert. denied 435 U.S. 928, 98 S.Ct. 1498, 55 L.Ed.2d 524 (1978). We find no error.

b. Did the trial court erroneously limit the testimony which could be offered in support of Gretzler's drug intoxication defense?

Before ruling on a State motion in limine to preclude psychiatric testimony other than opinions as to M'Naghten insanity and competency, the court heard offers of proof and testimony of expert witnesses outside the presence of the jury. On this basis, the court admitted expert testimony as to the general impact of certain drugs on the average person. The court barred testimony as to the possible impact of certain drugs on Gretzler, because no expert could either state to a reasonable medical certainty what the impact upon Gretzler would be or had personally observed Gretzler in a drug-intoxicated state. The court also refused to allow expert opinion on personality defects other than M'Naghten insanity or incompetence. Testimony of the defendant's sister, Joanne Gretzler, as to occasions when she had seen him take drugs, was admitted over the State's argument that such evidence was too remote to have probative value; Ms. Gretzler having last seen her brother on Christmas Day, 1972. She was precluded, however, from testifying about the defendant's hospitalization for drug overdose. in 1969, because she had no first-hand knowledge of that event.

At the conclusion of trial on 3 November 1975, the defense moved for a mistrial based on the court's limitation of psychiatric and lay witnesses of proof of drug intoxication. The court denied the motion.

 Evidence of voluntary intoxication is admissible only to negate specific intent. A.R.S. § 13–132. See also *State v. Steelman*, supra; *State v. Cooper*, 111 Ariz. 332, 529 P.2d 231 (1974). Testimony concerning intoxication should be limited to the time of the crime for which the defendant is being tried. *State v. Durgin*, 110 Ariz. 250, 517 P.2d 1246 (1974). In the instant case, it appeared that no one could testify as to the effect of drugs on Gretzler at the time of the crimes. We find no error.

c. Did the trial court err in admitting photographs of the murder victims into evidence?

Defendant objects to the admission into evidence of two photographs of the Sandbergs' corpses. The pictures were taken at

the couple's apartment. Each black and white photograph shows a fully dressed victim, bound and gagged, as discovered by the Tucson police.

 The admission or exclusion of photographs of murder victims is left to the trial judge's discretion. *State v. Thomas*, 110 Ariz. 120, 515 P.2d 865 (1973). As long as the photographs have probative value they are admissible, even though they may arouse the emotions of the jury. *State v. Ferrari*, 112 Ariz. 324, 541 P.2d 921 (1975). Here, as in *Ferrari*, supra, the pictures tended to corroborate the State's theory of how the homicide was committed, to illustrate and explain testimony, and to prove malice aforethought. We find no abuse of discretion in the trial court's ruling.

d. Was there adequate foundation for the admission of fingerprint evidence?

 At trial, the defense argued that fingerprint evidence was inadmissible for lack of foundation, in that the I.D. technician, Reese, was uncertain as to who lifted which prints. This objection is reiterated on appeal. Our reading of the trial transcript reveals that Reese clearly testified that he himself lifted all of them. His testimony fully describes the process by which each print was lifted and labelled, who labelled each print, and the location from which each was taken. The trial court properly admitted the fingerprint evidence.

e. Did the trial court err in admitting into evidence a hearsay account of a statement made by co-perpetrator Steelman?

 At trial, witness Donald Scott testified that while he, Gretzler, and Steelman were riding in the Sandbergs' car, Steelman said it was stolen from two people who had gone to Hawaii. Defense counsel objected that his hearsay account of Steelman's statement was erroneously admitted into evidence and argued that it was grounds for a mistrial. The court denied his mistrial motion. We agree with the trial court that the statement was admissible as an extrajudicial comment of a co-conspirator made in the course and furtherance of the conspiracy. See *State v. Speerschneider*, 25 Ariz. App. 340, 543 P.2d 461 (1975). We find no error.

f. Was the testimony of James Nelson erroneously admitted into evidence?

James Nelson, the manager of the condominium complex in which the Sandbergs lived, testified at Gretzler's trial. Nelson was not asked to identify Gretzler at trial. He testified that he was a friend of the Sandbergs, that they were students, that he saw a blue Pontiac Firebird, later shown to be Armstrong's drive into the housing complex and eventually reported its presence to the police. He also testified that he saw Michael Sandberg walk to his condominium with two men and that Sandberg did not respond to his friend's greeting. At the conclusion of this testimony, defense counsel moved that it be stricken from the record. He asserted that the testimony was irrelevant because it did not connect Gretzler to the crime. We do not agree.

 Nelson's testimony was probative of several links in the chain of events leading from the kidnapping of Armstrong to the murder of the Sandbergs. For example, he testified as to the approximate arrival time of the Firebird and stated that two men, at a time not long after Armstrong's kidnapping, accompanied an apparently uncomfortable Sandberg up the stairs to his condominium. Such testimony was relevant despite the fact that it did not specifically identify Gretzler. *State v. Kennedy*, 122 Ariz. 22, 592 P.2d 1288 (App.1979); *State v. Mosley*, 119 Ariz. 393, 581 P.2d 238 (1978). See also Rule 402, Arizona Rules of Evidence, 17A A.R.S.; *State ex rel. LaSota v. Corcoran*, 119 Ariz. 573, 583 P.2d 229 (1978). The trial judge did not err in refusing the defendant's motion to strike Nelson's testimony.

g. Further evidentiary issues raised on appeal.

 In what he calls "Issue XXXII" of his brief, Gretzler states that twenty-four

additional evidentiary rulings of the trial court were erroneous. The brief merely lists objections made at trial; the defendant in no way argues the merits of his objections. See Rule 31.13(c)(1)(iv) of the Arizona Rules of Criminal Procedure, 17 A.R.S. We have reviewed the issues and find no fundamental error.

Finally Gretzler asserts, without argument, that he was prejudiced by the court's admission of evidence that he was arrested by California police. The fact that Gretzler was arrested by somebody prior to trial was obvious to the jury. We are unable to perceive how testimony that Gretzler was held in another state on Arizona indictments would damage his case before the jury.

## CHALLENGES TO MISCELLANEOUS RULINGS MADE DURING TRIAL

a. Did the trial court improperly limit the scope of cross-examination?

Gretzler contends that the trial court erroneously prevented his cross-examining a State's witness as to whether Gretzler had said during a taped confession that he had never been arrested previously. Our review of the record reveals that Gretzler misstates the trial court's ruling. In fact, the court ruled that such cross-examination was improper as long as Gretzler's character was not in issue and that the court might rule differently if the defense chose to raise the issue of character.

Since Gretzler did not choose to raise his character as an issue and face the risks inherent in that choice, it was not error for the trial court to preclude cross-examination on that issue. *State v. Fierro*, 108 Ariz. 268, 496 P.2d 129 (1972); *Singh v. State*, 35 Ariz. 432, 280 P. 672, 67 A.L.R. 129 (1929).

The trial court also refused to allow the defense to cross-examine witness Armstrong concerning either a polygraph examination he took when the police investigated his kidnapping or his reasons for leaving a job with the Tucson Police Department. In a hearing outside the jury, it was shown that neither the polygraph test nor Armstrong's job record contained any evidence relevant to Gretzler's guilt or innocence. We have held that the

"absolute right to cross-examine 'within the proper bounds' does not license the defendant for a fishing expedition into completely irrelevant matter." *State v. Shaw*, 93 Ariz. 40, 44, 378 P.2d 487, 490 (1963). Accord, *State v. Williams*, 120 Ariz. 600, 587 P.2d 1177 (1978). See also *State v. Robison*, 125 Ariz. 107, 608 P.2d 44 (1980).

We find no error.

b. Did the trial court err in refusing a defense motion to continue after the jury was impaneled?

On 22 October 1975, after the jury was impaneled, the defense moved that the trial be continued. The two chief grounds for the request were that the defense was unable to find Michael Marsh, whom it wished to call as a witness, and that the defense wanted to obtain the results of ballistics and fingerprint tests prior to making an opening statement. The trial court, which, as we have discussed above, had been generous in granting continuances prior to impanelment of the jury, denied the motion.

The statement taken by police from the missing witness, Michael Marsh, indicates that his testimony would have been cumulative to that of Joanne McPeak and Donald Scott, who did testify at trial. In addition, there is "no indication that this testimony would influence the outcome of the trial or would otherwise be helpful to the defendant." *State v. Lacquey*, 117 Ariz. 231, 235, 571 P.2d 1027, 1031 (1977). See also *State v. Ebert*, 110 Ariz. 408, 519 P.2d 1149 (1974). Gretzler has not shown that either the ballistics or the fingerprint evidence would have benefited his case. We find no error.

c. Did the trial court err in upholding Willie Steelman's assertion of a Fifth Amendment right to remain silent when called to testify at Gretzler's trial?

Prior to trial, the defense notified the State that it intended to subpoena Gretz-

ler's codefendant, Willie Steelman, to testify at Gretzler's trial. Steelman, both personally and through his attorney, on Fifth Amendment grounds, consistently maintained that he would not testify or even speak to Gretzler's counsel.

The State made a motion in limine to preclude Steelman's appearing before the jury, if he intended to do no more than invoke his Fifth Amendment privilege. The trial court held a hearing outside the jury to determine whether Steelman still intended to remain silent. At this hearing, Steelman refused to utter a word. His attorney stated that he had advised his client to invoke the Fifth Amendment in order to protect his rights on appeal. Gretzler moved that, faced with Steelman's silence, the court order him to testify or order an examination into his competency. The court denied Gretzler's motions. Gretzler maintains that the judge erred in denying his defense motions to order Steelman to testify or to have him examined for competency.

■ The Fifth Amendment privilege is available to a convicted person when his conviction or sentence is being appealed. See *State v. Moncayo*, 115 Ariz. 274, 564 P.2d 1241 (1977); *State v. Cota*, 102 Ariz. 416, 432 P.2d 428 (1967), cert. denied 390 U.S. 1008, 88 S.Ct. 1256, 20 L.Ed.2d 109 (1968). See also *Cota v. Eyman*, 453 F.2d 691 (9th Cir. 1971).

■ In the present case, Steelman appealed both his conviction and his sentence, and they had not been finally disposed of on appeal. In these circumstances, he was entitled to claim his Fifth Amendment rights. The trial court correctly denied the defense motion to order Steelman to testify or undergo an examination for competency.

d. Did the trial court err in precluding Steelman from asserting his Fifth Amendment privilege in the presence of the jury?

The trial court also granted the State's motion in limine to preclude Steelman from appearing before the jury if he intended to remain silent. Gretzler contends that this was error and we agree. The "privilege against self-incrimination is a personal immunity for the witness and does not disqualify him from being called * * *." *State v. Cota*, supra, 102 Ariz. at 421, 432 P.2d at 433. In *State v. Ortiz*, 113 Ariz. 60, 546 P.2d 796 (1976), the trial court ruled that the defense should be precluded from calling two witnesses who would certainly invoke their privilege against self-incrimination. We reversed on Sixth Amendment grounds. We held that while the defendant's Sixth Amendment right to call witnesses would not enable him to force them to speak, he was entitled to show that he had presented "all the relevant evidence at [his] disposal." *Ortiz*, supra, 113 Ariz. at 61, 546 P.2d at 797.

■ We believe the trial court erred in precluding Steelman from appearing before the jury even though it was apparent that he would claim the privilege and not testify. We do not believe, however, that this error reasonably could be thought to have "contributed to the conviction." *Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171, 173 (1963). The defense in the instant case was deprived of only the bare right to show Steelman to the jury. It was not likely that Steelman's absence would have any weight whatever on the trial. Gretzler did not indicate, by means of an offer of proof, what he hoped to gain from Steelman or the questions that would be asked of him. Gretzler's conviction was based on solid evidence, including eye witness testimony, his use of property stolen from victims, fingerprints, and copious statements from Gretzler himself. Steelman's non-appearance at trial could not have contributed to the verdict. We believe that while the trial court erred in denying Gretzler's Sixth Amendment right to compel witnesses in his behalf, *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); *Ortiz*, supra; this error was "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 23, 87 S.Ct. 824, 828, 17 L.Ed.2d 705, 711 (1967). See also *Harrington v. California*,

395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969).

e. Did the trial court require Gretzler to offer proof on any element of first degree murder?

The State brought evidence to prove beyond a reasonable doubt every element of first degree murder, including malice aforethought. A.R.S. § 13–451. The defense then had the opportunity to present evidence of drug intoxication to negate the State's evidence of specific intent.

Gretzler argued that the allocation to the defense of the burden of persuasion as to drug intoxication was impermissible under *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). In *Mullaney*, the United States Supreme Court invalidated a newly revised Maine murder statute which allowed the jurors to presume malice from a deliberate killing and required the defendant to negate this presumption by proof that he acted in the heat of passion. In *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977), however, the court upheld a New York murder statute requiring the state to prove the intent element and establishing extreme emotional disturbance as an affirmative defense the defendant must prove by a preponderance in order to reduce the crime to manslaughter. The United States Supreme Court held that defendants may be required to prove affirmative defenses where the prosecution is required to prove intent, and every other element of the crime charged, beyond a reasonable doubt. *Patterson*, supra. See also *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952).

The procedure followed at Gretzler's trial is distinguishable from the Maine procedure condemned by *Mullaney*. Here the State was granted no presumption as to any element of first degree murder. As in *Patterson*, the State was required to prove intent beyond a reasonable doubt. We find no error.

f. Did the trial court err in denying Gretzler's motion for acquittal?

At the conclusion of the State's case, Gretzler made a motion for judgment of acquittal. The court denied this motion and the defense now argues that the denial was error. We do not agree. There was substantial evidence that Gretzler committed the crimes with which he was charged. *State v. Parker*, 113 Ariz. 560, 558 P.2d 905 (1976). We find no error.

g. Did the trial court err in instructing the jury?

Gretzler reasserts on appeal his objections to the trial judge's refusal to give a number of his suggested jury instructions. Considering the instructions as a whole, as we must, *State v. Carr*, 108 Ariz. 203, 495 P.2d 134 (1972), we find that most of the instructions about which the defendant complains were substantially covered by the court's own instructions. If the substance of proposed instructions is adequately covered by instructions actually given by the court, there is no error in their being refused. *State v. Cookus*, 115 Ariz. 99, 563 P.2d 898 (1977). See also *State v. Melendez*, supra.

Defendant's suggested instruction Number 9 read as follows:

"The testimony of any witness whose self-interest or attitude is shown to be such as might tend to prompt testimony unfavorable to the accused, should always be considered with caution and weighed with great care."

This instruction was properly refused as an improper comment on the evidence. *State v. Settle*, 111 Ariz. 394, 531 P.2d 151 (1975). See Art. 6, § 27, Arizona Constitution.

The trial court also refused defense instruction Number 34 which stated:

"You are instructed that where a robbery is completed prior to the death of the decedent, you may not consider the instructions concerning felony-murder insofar as determining whether the defendant is guilty of first degree murder. In other words if the robbery was completed

before the time of the Sandberg's deaths, you will find the defendant not guilty of murder first degree under the felony-murder theory."

This instruction incorrectly states the felony-murder rule which does not refer to the time of death of the victim, but focuses on whether a death-causing act is committed in the course of and in furtherance of the felony offenses. *State v. Ferrari*, supra. A felony-murder victim might well die some time after the underlying felony is completed. The trial court properly refused this instruction. *State v. Richmond*, 114 Ariz. 186, 560 P.2d 41 (1976), cert. denied 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

▉ In addition, Gretzler objects to certain of the instructions actually given the jury. Specifically, he challenges the court's reasonable doubt instruction and those covering voluntary intoxication and its effects on the intent element of the various crimes with which he was charged. In neither case does he give specific grounds for his objections, and we have found none.

As to the instruction on reasonable doubt, we find no error. *State v. Carr*, supra.

Neither do we find the court's intoxication instruction defective. The instruction adequately covered the impact of voluntary intoxication on the intent in the various crimes with which Gretzler was charged and correctly stated the law. *State v. Richardson*, 110 Ariz. 48, 514 P.2d 1236 (1973), cert. denied 415 U.S. 929, 94 S.Ct. 1439, 39 L.Ed.2d 487 (1974). We find no error.

## OBJECTIONS TO RULINGS INVOLVING THE EXPENDITURE OF PUBLIC FUNDS FOR THE DEFENSE

Gretzler, an indigent, makes numerous claims that the court erroneously limited the expenditure of public money needed to aid the defense. The defendant was denied funds for an extra attorney, for certain out-of-state travel and investigation (some money was allowed for these purposes), and for more extensive neurological and physical examinations.

A.R.S. § 13–1673(B), now A.R.S. § 13–4013(B), allows a court in a capital case to appoint for an indigent "such investigators and expert witnesses as are reasonably necessary adequately to present his defense * * *." The Ninth Circuit Court of Appeals, in interpreting a substantially identical federal provision, 18 U.S.C. § 3006A(e)(1), has held that the fundamental issue in reviewing trial court rulings under such statutes is "whether the denial or restriction of investigative funds has substantially prejudiced the defendant * * *." *Mason v. Arizona*, 504 F.2d 1345, 1352 (9th Cir. 1974), cert. denied 420 U.S. 936, 95 S.Ct. 1145, 43 L.Ed.2d 412 (1975).

We have stated:
"A.R.S. § 13–1673(B) is not to be construed as mandating, in every case, an appointment of investigators or experts, nor the expenditure of public money for their use, merely upon application. There must be a finding, by the trial court, (1) that the defendant is unable to pay for such services himself and (2) that the appointment and expenditure is reasonably necessary to present an adequate defense. This determination, like so many others, rests in the sound discretion of the trial court. In the absence of a showing that the determination was an abuse of that discretion, it will not be disturbed on appeal. A.R.S. § 13–1673(B). *Accord, State v. Frideaux*, 207 Kan. 790, 487 P.2d 541 (1971). *Cf.Mason v. State of Arizona*, supra." *State v. Knapp*, 114 Ariz. 531, 540–41, 562 P.2d 704, 713–14 (1977), cert. denied 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

▉ Gretzler first asserts that the trial court failed to provide adequate psychiatric examinations for him. Prior to trial, Gretzler was examined by two Arizona doctors to determine his competence to stand trial and whether he was M'Naghten same. See DEFENDANT'S COMPETENCE TO STAND TRIAL, supra. Prior to sentencing, Gretzler was given a full battery of psychological tests and examined by the diagnostic psychiatrists at Arizona State Prison, and was

given neurological tests and sleeping and waking EEG examinations. He was also granted funds and a continuance so that the defense could telephone and write a California psychiatrist in order to determine whether examination by that doctor and/or further psychiatric and neurological tests would be at all likely to produce mitigating material for the defense. The California psychiatrist did not advise that further examinations were necessary, or even particularly desirable. Gretzler never met either the conditions of A.R.S. § 13–1673(B), supra, or the conditions of Rule 11.3(f) of the Arizona Rules of Criminal Procedure, 17 A.R.S., which provides that additional expert assistance may be made available when an appointed expert advises the court that such examinations are necessary. We find no error in the court's refusal to grant further examinations. *State v. Watson*, 120 Ariz. 441, 586 P.2d 1253 (1978), cert. denied 440 U.S. 924, 99 S.Ct. 1254, 59 L.Ed.2d 478 (1979).

 Secondly, Gretzler argues that it was error for the trial court to deny some of his requests for transcripts to be provided at State expense. Voluminous transcripts were provided him and he has not shown that he was denied transcripts reasonably necessary to help his defense. We find no error.

 Gretzler finally contends that it was error to deny his request for daily transcripts. The court ruled:

"THE COURT: Based upon the holding of the Court in *State v. Casey* I'll deny the motion. Casey indicates that if you want a particular witness' testimony and you state why, then I can, perhaps, order that to be transcribed. So as we get into the trial, I'm going to ask that we take notes as to what witnesses are saying, and if you find you need an exact quote of a witness and would require that transcription, I can rule on it at that time.

"MR. HOFFMAN: The problem I have, I don't know if all lawyers have it, it's impossible for me to take notes when I'm examining witnesses, and the other problem I have, when I take notes when someone else is examining the witness more frequently than not I can't read my handwriting.

"THE COURT: I don't know how to help you with the latter two problems."

We find no error. *State v. Casey*, 10 Ariz.App. 516, 460 P.2d 52 (1969).

### ALLEGED MISCONDUCT OF THE TRIAL JUDGE AND THE PROSECUTOR'S OFFICE

a. Should the trial judge have disqualified himself from sentencing?

On 15 September 1976, Gretzler filed a motion for change of judge, arguing that the trial judge, William E. Druke, should disqualify himself from sentencing because he was biased against the defense by publicity utilized by Stephen Neely in his campaign for Pima County Attorney, or because he involved himself in preparing that publicity. After a two-day hearing, the Associate Presiding Judge of the Pima County Superior Court denied the motion.

Stephen Neely was a deputy prosecutor in the office of the Pima County Attorney. In 1976, Neely became a candidate for the office of Pima County Attorney, and, before Gretzler had been sentenced, the Neely campaign used the Gretzler-Steelman crimes in advertising to convey the notion that Neely would be "tougher on crime" than his opponent. The advertising appeared after the jury finding of guilt. The record indicates that the trial judge never saw the published advertisements and was not aware of the additional publicity they generated until it was called to his attention by the defense.

 We are satisfied that Judge Druke was not prejudiced by the campaign publicity and that he in no way participated in, or approved of, the Neely advertising. The defense failed to show bias or prejudice on Judge Druke's part and was properly denied a change of judge. *State v. Myers*, supra; *State v. Neil*, 102 Ariz. 110, 425 P.2d 842 (1967).

b. Was the Pima County Attorney's Office guilty of misconduct in regard to the Neely publicity or in seeking the death penalty in Gretzler case?

█ Prior to sentencing, the defense alleged that the prosecutor's office had abused its discretion in using the Steelman and Gretzler trials to generate pro-Neely publicity. Gretzler was unable to show that Neely's fellow prosecutors had, in fact, been involved in Neely's advertising. To the extent that Neely's fellow prosecutors may have aided him in his campaign, they did not injure the defense. The verdict against Gretzler was reached long before the Neely campaign began, and it did not prejudice the sentencing judge.

█ Gretzler urges, however, that the prosecutor's decision to seek a death penalty was an abuse of discretion and hinted that it was politically motivated. We find no reason to believe that the decision was anything other than a valid exercise of discretion. Indeed, the facts of this case are such that it would be most surprising if the State had not asked for the death penalty. The fact that a prosecutor has discretion in charging and deciding whether to ask for the death penalty does not render the imposition of capital sentences unconstitutionally arbitrary. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

### DEATH PENALTY

█ Defendant's challenge to the constitutionality of A.R.S. §§ 13–451 to –454, this State's death penalty statute, is based on contentions answered by this court in *State v. Watson,* supra.

### EVIDENCE OF AGGRAVATING CIRCUMSTANCES PRESENTED AT SENTENCING

Gretzler raises seven issues concerning evidence received and findings made at the aggravation and mitigation hearing. Since Gretzler will have to be resentenced and will be entitled to a new hearing before sentencing, we need not consider these questions at this time.

### CONCLUSION

The verdicts and judgments of guilt are affirmed. The sentences other than the death penalty are affirmed, and the matter is remanded for resentencing on the two murder convictions pursuant to *State v. Watson,* supra, within 90 days of the issuance of the mandate herein.

STRUCKMEYER, C. J., HOLOHAN, V. C. J., and HAYS and GORDON, JJ., concur.